**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Shenique THOMAS, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 26, 2004.

Filed Jan. 21, 2005.

Ellen K. Barry, Carlisle, for appellant.

David J. Freed, Asst. Dist. Atty., Carlisle, for Com., appellee.

BEFORE: STEVENS, McCAFFERY, and TAMILIA, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered by the Court of Common Pleas of Cumberland County after a jury convicted Appellant ("Mother")[1] of involuntary manslaughter,[2] aggravated assault,[3] and endangering the welfare of a child.[4] A mistrial was declared with respect to the charge of murder in the third degree[5] as the jury was unable to reach a verdict. On appeal, Mother claims that the evidence was insufficient as a matter of law to sustain her conviction for aggravated assault because the Commonwealth failed to prove the use of force or threat of force.[6] Secondarily, Mother claims that endangering the welfare of a child was a more appropriate charge in this matter. We affirm.

¶ 2 In July 2002, Tosheka Dredden, Mother's sister, contacted Children and Youth Services ("CYS") to express concerns about the condition of Mother's four-year-old son, QT. N.T. 7/15/03 at 72–139. Jill Olon, a CYS worker, scheduled a visit with the family for July 23, 2002. N.T. 7/15/03 at 149. When Ms. Olon arrived at Mother's residence, no one was home. N.T. 7/15/03 at 150. Ultimately, Mother, who was driving a Mercedes, returned to the residence but neither Father, nor the family's five children, appeared. N.T. 7/15/03 at 150–55. Ms. Olon noted that the outside of the residence and the first floor were in good condition. N.T. 7/15/03 at 152. When questioned about QT, Mother, who was preoccupied with the question of who contacted CYS, claimed that QT was age three, rather than age four; showed Ms. Olon a picture of QT's cousin, whom she claimed was QT; and stated that QT had recently been examined at the Sadler Clinic. N.T. 7/15/03 at 150–56. Ms. Olon made arrangements to meet the rest of the family the next day; when she returned to her office she contacted the Sadler Clinic, who had no record of QT. N.T. 7/15/03 at 159–160. Ms. Olon contacted Mother who, when prodded, provided the names of other facilities where QT had been seen but none of these facilities had any records on QT. N.T. 7/15/03 at 159–161.

¶ 3 Ms. Olon saw QT the next day and described him as being "grossly underweight and under height," he was skin and bones, had no muscles, he had excessive hair growth on his body, and a distended stomach. N.T. 7/15/03 at 165. Ms. Olon described QT as looking like a "third-world

1. Mother was tried jointly with her husband ("Father").

2. 18 Pa.C.S. § 2504.

3. 18 Pa.C.S. § 2702(a)(1).

4. 18 Pa.C.S. § 4304.

5. 18 Pa.C.S. § 2502(c).

6. Mother does not challenge her convictions on the charges of involuntary manslaughter and endangering the welfare of a child.

famine victim." N.T. 7/15/03 at 165. However, Mother claimed that QT had eaten a great deal of food that day and generally ate as much as a grown man. N.T. 7/15/03 at 168–69. Ms. Olon realized that QT needed immediate medical attention; however, Mother and Father refused to take QT for medical treatment and only agreed after Ms. Olon said that CYS would pay for the treatment. N.T. 715/03 at 166–67.

¶ 4 QT was taken to Carlisle Hospital[7] where he was seen by Dr. Hoffman. N.T. 7/15/03 at 233. QT weighed twenty pounds and was under two-and-one-half feet tall. N.T. 7/15/03 at 170. Dr. Hoffman testified that he was shocked by QT's emaciation which had existed for a "sustained period of time." N.T. 7/15/03 at 235–36. Dr. Hoffman stated that QT had a "profoundly distended stomach," tiny extremities, little muscle, an enlarged head, significant bruising, multiple healing rib fractures, lanugo hair,[8] a bezoar,[9] compromised lung capacity, and, in July, was hypothermic. N.T. 7/15/03 at 237–46. Based upon QT's serious condition, Dr. Hoffman recommended that he be transferred to Hershey Medical Center. N.T. 7/15/03 at 245.

¶ 5 On July 26, 2002, while being treated at Hershey, QT, who was being given an intravenous solution to bring up his low phosphorus levels, suffered a sudden drop in his sodium levels, triggering two seizures. N.T. 7/16/03 at 185; 7/18/03 at 749–59. He was transferred to the Intensive Care Unit and placed on life support. N.T. 7/15/03 at 185; 7/18/03 at 749–59. On July 30, 2002, following a court hearing, Hershey was permitted to remove QT's life support, after which, QT died. N.T. 7/15/03 at 185.

¶ 6 A jury trial commenced on July 14, 2003; on July 24, 2003, Mother was found guilty of involuntary manslaughter, aggravated assault, and endangering the welfare of a child. The jury was unable to reach a verdict on the charge of murder in the third degree and the trial court declared a mistrial with respect to that charge. Mother was sentenced to an aggregate term of five to ten years of incarceration. Mother filed post-trial motions which were denied on January 22, 2004. This appeal followed. Mother was ordered to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), she filed a 1925(b) statement, and the trial court subsequently issued an opinion.

■ ¶ 7 On appeal, Mother contends insufficient evidence exists to sustain her conviction for aggravated assault. For the reasons discussed below, we find that the evidence was sufficient to sustain Mother's conviction.

■ ¶ 8 Our standard of review for sufficiency of the evidence claims is well settled:

> In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable [the factfinder] to find every element of the crime beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links

---

7. QT had only been to see a doctor on three prior occasions, at birth, when he was nine months old, and when he two years old, at which time he was seen by a orthopedic surgeon because he was slow to walk. N.T. 7/15/03 at 171–78.

8. Lanugo hair is seen in cases in significant undernutrition. N.T. 7/15/03 at 236.

9. A bezoar is a collection of non-food material in the stomach. N.T. 7/9/03 at 12.

the accused to the crime beyond a reasonable doubt. Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty."

*Commonwealth v. Coon,* 695 A.2d 794, 797 (Pa.Super.1997) (citations omitted). Moreover, when reviewing the sufficiency of the evidence, this Court may not substitute its judgment for that of the fact-finder; if the record contains support for the convictions they may not be disturbed. *Commonwealth v. Marks,* 704 A.2d 1095, 1098 (Pa.Super.1997) (*citing Commonwealth v. Mudrick,* 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986)). Lastly, the finder of fact may believe all, some or none of a party's testimony. *Commonwealth v. Purcell,* 403 Pa.Super. 342, 589 A.2d 217, 221 (1991).

¶ 9 In the case at bar, Mother was convicted of aggravated assault. The crime of aggravated assault is set forth in 18 Pa. C.S.A § 2702(a)(1), which states:

(a) Offense defined.—A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under the circumstances manifesting extreme indifference to the value of human life.

18 Pa.C.S.A. § 2702(a)(1).

■ ¶ 10 Mother argues that the evidence was not sufficient to sustain her conviction because the Commonwealth failed to demonstrate either the use of force or the threat of force. However, as the Commonwealth correctly notes, evidence of the use of force or the threat of force is not an element of the crime of aggravated assault. Mother has offered nothing which demonstrates that the Pennsylvania Courts have ever required proof of the use of force or the threat of force to sustain a conviction for aggravated assault.

■ ¶ 11 Rather, Mother lists a series of cases in which parents were accused of neglecting their child and notes that in those cases the parents were not charged with aggravated assault. Mother lists a second series of cases in which parents physically attacked their child and notes that in those cases the parents were charged with aggravated assault. However, what charges to file is within the discretion of the prosecution. *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *Commonwealth v. Berryman,* 437 Pa.Super. 258, 649 A.2d 961, 974 (1994). The mere fact that prosecutors have generally charged parents with endangering the welfare of a child in certain types of child abuse cases and aggravated assault in other types of child abuse cases does not mean that, as a matter of law, the evidence will not be sufficient to sustain the conviction for aggravated assault in a case where a child is starved to death. We have thoroughly reviewed the evidence in this case and, for the reasons discussed below, find that the evidence was sufficient to sustain a conviction for aggravated assault.

¶ 12 At trial, numerous fact witnesses, including those testifying on behalf of both parents, testified that QT was generally kept hidden, while his four sisters were routinely seen outside the home or in the public areas of the home; that QT appeared unusually small; and, when they expressed concerns to Mother or Father regarding QT's appearance, their concerns were dismissed.

¶ 13 Specifically, both paternal grandparents testified they had never met QT, and the paternal grandmother testified that her son told her that he thought QT was a midget. N.T. 7/14/03 at 23, 27–28. The maternal grandmother testified that,

prior to QT's death, she had last seen QT in 2000. N.T. 7/14/03 at 33. Maternal grandmother stated QT was generally put to bed or kept in his room much of the time as a punishment for bed wetting and because Mother believed that the bed wetting was caused by QT's laziness. N.T. 7/14/03 at 35–37. Maternal grandmother said Mother believed that QT's inability to walk quickly was caused by laziness. N.T. 7/14/03 at 36. Maternal grandmother also testified that, after seeing QT in 2000, she and her husband were so concerned about his health that they attempted to persuade the parents to take QT to a doctor[10] and, after that date, Mother and Father no longer remained in contact with them. N.T. 7/14/03 at 38. The maternal grandfather confirmed his wife's testimony. N.T. 7/14/03 at 45–69. He further testified that Mother became upset if anyone paid attention to QT. N.T. 7/14/03 at 48. He also stated he had contact with both parents in 2002 and, at that time, they told him that QT was getting tall but, when he saw the photographs taken of QT by Ms. Dredden, he believed QT was in poor health. N.T. 7/14/03 at 55.

¶ 14 Mother's sister, Tosheka Dredden, testified that she saw QT in July 2000 and then, again, in July 2002. N.T. 7/15/03 at 73–74. Ms. Dredden testified she was not permitted to talk with QT on the telephone and, when she visited the Mother and Father, QT was kept isolated and was always being punished while his sisters were allowed to do whatever they wanted. N.T. 7/15/03 at 75–77. Ms. Dredden stated during the July 2002 visit, QT was generally not permitted to play with the other children; the upstairs of the house stank of urine; QT's bathroom was filthy; and, while the girls had many toys in their room, QT had nothing. N.T. 7/15/03 at 77–79. She further testified, during a visit to

Father's place of employment, QT was made to sit on a toilet for approximately one hour. N.T. 7/15/03 at 82. Ms. Dredden said she was baby-sitting QT when he wet himself, she gave him a bath and attempted to find clean clothing for him but could not, when Mother arrived home she asked for clean clothing but Mother dressed QT in his urine-soaked shirt. N.T. 7/15/03 at 85–90. Ms. Dredden testified she took photographs of QT because she was extremely concerned about him, was afraid something would happen, and wanted proof of his appearance. N.T. 7/15/03 at 89. She also testified that, during the visit, she never saw QT being given any food or drink unless she gave it to him. N.T. 7/15/03 at 94.

¶ 15 Charlyne Bream, a friend of Mother's, testified she had been to Mother's home several times and had seen the girls but not QT. N.T. 7/17/04 at 522–29. Nichole Goodyear, another friend of Mother's, testified she had seen the girls but never QT and was not even aware that Mother had a son. N.T. 7/17/03 at 529–37. Pamela Hoover, a neighbor, testified she regularly saw the girls but only saw QT once. N.T. 7/17/03 at 537–44. Eve Chance, another neighbor, testified she regularly saw the girls going out with their parents but had never seen QT. N.T. 7/17/03 at 545–50. Debra Sturtz, a neighbor, testified she only saw the girls not QT. N.T. 7/17/03 at 551–67. John Rinker, who rented the apartment over Mother's garage, testified he had seen the girls but was not even aware there was a boy living in the house. N.T. 7/17/03 at 567–73. Larry Diehl, Father's former employer, and Carol Welter, a former colleague of Father's both testified they had met the girls on several occasions but not QT. N.T. 7/17/03 at 615–31. Ms. Welter testi-

---

**10.** As a result of this, Mother and Father took QT to the pediatric orthopedic surgeon.

fied that, when she came to the family's home, she was told QT was being kept upstairs as a punishment; she further testified QT was left alone in the residence. N.T. 7/17/03 at 624–26.

¶ 16 George Hackenberger, III, a colleague of Father's, testified about his observations of QT and his sisters. N.T. 7/17/03 at 573–94. Mr. Hackenberger saw the children because they often spent the day at Father's place of employment. N.T. 7/17/03 at 576. Mr. Hackenberger noted QT seemed unusually small, had excessive facial hair, and a bloated belly; when questioned, Father stated QT had unspecified medical problems which caused his smallness. N.T. 7/17/03 at 576–77. QT was so small that Mr. Hackenberger believed he was the youngest child.[11] N.T. 7/17/03 at 580. Mr. Hackenberger further testified the girls were clearly the favored children. N.T. 7/17/03 at 579. Lastly, Mr. Hackenberger described certain occasions when both his children and Mother's were at the office and Mr. Hackenberger purchased food for the children; he noted QT immediately grabbed handfuls of pizza and started "shoving" them down his mouth. N.T. 7/17/03 at 581. Mr. Hackenberger's minor children, GH and CH also testified at trial, describing how QT was forced to remain in a bathroom in the office for hours at a time, sometimes as much as twelve hours in a day, and was not permitted to play with the other children. N.T. 7/17/03 at 594–615.

¶ 17 Four of Mother's friends testified on her behalf, claiming they had seen QT. N.T. 7/21/03 at 994–1042. However, when pressed, each of these witnesses admitted they had only seen QT a handful of times and it was much more common to see Mother alone or with the girls than with QT. N.T. 7/21/03 at 994–1042. Further,

two of these witnesses admitted QT seemed small. N.T. 7/21/03 at 1023, 1030. One of the witnesses, Lisa Bowes, acknowledged she had asked Mother if there was something wrong with QT and was told he had a "slow growing disease." N.T. 7/21/03 at 1030.

¶ 18 At trial, CYS worker Ms. Olon and several police officers testified to the appalling conditions which prevailed on the second floor of the house, particularly in QT's room. The witnesses noted the stench of urine on the second floor and that while the girls' room contained ample furniture, toys, and clothing, QT's room was almost bare, containing a plastic mattress, with no sheet, which was smeared with feces, a feces-smeared teddy bear lying on the floor, and clumps of hair on the floor; the toilet in the bathroom off QT's room was clogged; the closet in QT's room contained soiled linens, soiled clothing, rotten food, a rotten rug, and insulation; the rug and insulation found in the closet had finger and bites marks on them; N.T. 7/15/03 at 181–84, 280–82; N.T. 7/16/03 at 378–458.

¶ 19 Further, numerous witnesses testified both with respect to QT's medical condition, and to their observations of him at both Carlisle Hospital and Hershey Medical Center. As discussed in greater detailed above, Dr. Hoffman testified as to QT's condition when he examined him in the Carlisle Hospital emergency room. Dr. Hoffman also offered his expert opinion, stating he believed that QT's malnutrition and failure to thrive were not caused by an underlying medical condition. N.T. 7/15/03 at 254–59.

¶ 20 Paul Daube, a trace evidence specialist testified he had conducted tests on QT's stomach contents, his GI tract, his

---

11. In fact, QT was the third of five children, although the youngest child was not born at the time Mr. Hackenberger made the statement.

fingernails, and on vomit stains on his pajamas. N.T. 7/17/03 at 488–522. Mr. Daube discovered human hair and insulation in QT's GI tract; human hair and mattress stuffing in his stomach; insulation fibers in his vomit; and insulation fibers in his fingernails. N.T. 7/17/03 at 488–522.

¶ 21 Dr. Geskey, QT's attending pediatrician at Hershey testified QT was well under the fifth percentile in weight, height, and head circumference; his heart rate was fast and his blood pressure was high; he was suffering from a heart murmur; and had four fractured ribs in various states of healing. N.T. 7/17/03 at 640–647, 652. Dr. Geskey said QT had no signs of a chromosome disorder or other genetic malady, although Mother claimed QT was a midget. N.T. 7/17/03 at 647–48. Dr. Geskey stated it was difficult to obtain a medical history for QT from Mother and Father. N.T. 7/17/03 at 649–51. Dr. Geskey testified QT was severely malnourished, had delayed bone age, had a bezoar, and his liver function was elevated. N.T. 7/17/03 at 651–654. Dr. Geskey noted QT gained ten ounces during his first day at the hospital. N.T. 7/17/03 at 657. Dr. Geskey offered his expert opinion that QT's problems were not caused by an underling medical condition and stated if a child gains weight during his stay at a hospital his failure to thrive can be attributed to the care given by his parents. N.T. 7/17/03 at 674.

¶ 22 Dr. Field, a pediatric gastroenterologist and nutrition expert, testified QT was extremely small and wasted. N.T. 7/17/03 at 694. He noted that, when questioned, Mother was unable to describe any specific medical problems suffered by QT. N.T. 7/17/03 at 695. He also noted he had observed QT eating large amounts of food at the hospital. N.T. 7/17/03 at 696.

¶ 23 Dr. Ladda, a pathologist and geneticist at Hershey, examined QT and noted he was extremely small. N.T. 7/17/03 at 700. He offered his expert opinion that QT was not suffering from any genetic or chromosomal abnormality that could have caused his malnutrition and failure to thrive. N.T. 7/17/03 at 707.

¶ 24 Dr. Michael Hulse, a pediatric radiologist at Hershey, testified via videotape. N.T. 7/9/03 at 4. Dr. Hulse performed a skeletal survey, an upper GI survey, and various chest and stomach X-rays on QT. N.T. 7/9/03 at 4–14. Dr. Hulse testified QT had wasted musculature and four rib fractures, two on each side of his rib cage. N.T. 7/9/03 at 5. Dr. Hulse noted that, in order to perform an upper GI survey, the patient has to drink barium and it is normally difficult to get children to drink it. N.T. 7/9/03 at 6–7. However, QT had a "veracious (sic) appetite for the barium," so much so that he had to literally pull the bottle out of his hands. N.T. 7/9/03 at 11. Dr. Hulse stated QT had a bezoar in his stomach that appeared to be one solid ball which distended the stomach. N.T. 7/9/03 at 12. He also testified QT was suffering from severe gastric reflux. N.T. 7/9/03 at 21.

¶ 25 Rene Shatto, QT's social worker at Hershey, testified QT was physically and developmentally delayed. N.T. 7/17/03 at 715–17. She testified QT was very small with a distended belly and noted he did not appear to know how to use utensils when eating. N.T. 7/17/03 at 717–18.

¶ 26 Jennifer Shay, a registered nurse at Hershey, testified as to her observations of Mother during QT's stay at Hershey. She testified that Mother stated the hospital was "babying" QT, who was a slow grower, N.T. 7/17/03 at 727–33. Ms. Shay said Mother complained the hospital was giving QT too much food, and, when QT appeared too ill to respond to Mother, Mother com-

plained that QT was "copping an attitude." N.T. 7/17/03 at 727–33. Nicole Yorick, another registered nurse at Hershey, confirmed QT was very small and seemed lethargic most of the time. N.T. 7/17/03 at 735–36.

¶ 27 Dr. Wiley, a medical expert testifying on behalf of Mother and Father, testified that he believed that QT's malnourishment was caused by an underlying medical problem of malabsorbtion. N.T. 7/18/03 at 778. However, Dr. Wiley admitted QT did not fit into any of the clinical patterns for malnourishment caused by an underlying medical problem. N.T. 7/18/03 at 766. He also acknowledged his malabsorbtion theory was based on his accepting Mother and Father's statements that QT was fed on a regular basis, and acknowledged there was no medical evidence to disprove the Commonwealth's claim that Mother and Father starved QT. N.T. 7/18/03 at 778. He further characterized his testimony, that there was an underlying medical cause to QT's malnourishment, as a "suspicion." N.T. 7/18/03 at 782. Lastly, Dr. Wiley admitted that, even if QT's malnourishment was caused by a malabsorbtion problem, chronic starvation can lead to malabsorbtion problems. N.T. 7/18/03 at 808.

¶ 28 Dr. Cochran, a pediatric gastroenterologist and nutrition expert, testified the most common cause of failure to thrive is psycho-social. N.T. 7/18/03 at 842. He noted, at birth, QT was at the fifteenth percentile for weight, height, and head circumference. N.T. 7/18/03 at 847. QT was then not seen by a doctor until he was nine months old, causing his immunizations to be severely delayed, at which time he had dropped to the fifth percentile for weight, the tenth for height, and the tenth for head circumference. N.T. 7/18/03 at 849. He then did not see a doctor until he was twenty-eight months old, at which time he was examined by an orthopedic surgeon

and his weight, height, and head circumference had all dropped below the fifth percentile. N.T. 7/18/03 at 850. Dr. Cochran said that, while QT suffered from some developmental delays, there was no medical evidence of cerebral palsy and no evidence of orthopedic problems. N.T. 7/18/03 at 850–52. Dr. Cochran said, at the time QT was admitted to Hershey, he was in need of acute medical care. N.T. 7/18/03 at 858. Dr. Cochran said, in his expert opinion, QT's seizures were caused by refeeding syndrome and low phosphorus levels were a risk when refeeding a severely malnourished child. N.T. 7/18/03 at 866. Dr. Cochran testified, in his expert opinion, QT suffered from severe, chronic malnutrition, there was no medical or organic cause for that malnutrition; rather, the malnutrition, which was life-threatening, was caused by Mother and Father's failure to feed QT. N.T. 7/18/03 at 868–883.

¶ 29 Dr. Ross, the forensic pathologist who performed QT's autopsy, testified QT was emaciated, had no fat or muscles, and every one of his organs was atrophied. N.T. 7/18/03 at 917–25. He stated QT did not suffer from any underlying natural diseases, his death was caused by complications from starvation, and there were no underlying natural causes of his malnourishment. N.T. 7/18/03 at 930–35. Dr. Ross averred, in his expert opinion, that as a result of the starvation, every cell in his body was sick, and QT was neglected and starved to death. N.T. 7/18/03 at 936–40.

¶ 30 Dr. Hoffman, a pathologist testifying on behalf of Mother and Father, acknowledged QT was severely malnourished. N.T. 7/21/03 at 1055. He admitted he could not say what the etiology of QT's malnutrition was and could not say for certain whether the etiology was organic or inorganic. N.T. 7/21/03 at 1120–28. However, he testified that you could not

rule out celiac disease [12] or malabsorbtion as a cause of QT's malnutrition. N.T. 7/21/03 at 1095 and 1127.

¶ 31 It was well within the province of the jury to find credible the medical testimony that QT had been starved to death, particularly given the equivocal testimony of both defense medical experts and their inability to pinpoint with any degree of certainty any underlying medical cause for QT's malnourishment. Further, it was within the province of the jury to believe the testimony of the witnesses who testified QT was scapegoated by his parents and kept away from people. Moreover, the jury was free to believe the testimony that Mother and Father lied about QT's age, lied about obtaining medical treatment for him, and, that, when people expressed concern about QT's small and emaciated appearance, Mother and Father told them QT was a midget, or suffered from a "slow growing" disorder despite the fact they never took QT for medical treatment. The jury was also free to disregard Mother and Father's self-serving testimony that QT ate like a man, all the evidence in the case was manufactured by CYS or the police or Hershey Medical Center, and, despite all the evidence to the contrary, this twenty-pound, four-year-old was a normal, healthy child.

¶ 32 Given the evidence enumerated above, we find there was more than sufficient evidence to show Mother starved QT, failed to obtain any medical assistance for him until forced to by CYS, and forced QT to live in filthy and inhumane conditions, such that QT ended up eating human hair, insulation, and mattress stuffing. This evidence was ample to show Mother attempted to cause, and did cause, serious bodily injury to QT, resulting in his death by starvation, and she intentionally, knowing-ly, or recklessly did so, manifesting extreme indifference to the value of human life.

¶ 33 Mother also claims she should only have been charged with endangering the welfare of a child, rather than aggravated assault as endangerment is the more appropriate charge in this matter. We disagree.

¶ 34 As noted above, the prosecutor has great discretion in selecting which charges to file. Where, as here, the evidence was more than sufficient to support the charge of aggravated assault, we will not disturb that discretion.

¶ 35 For all of the foregoing reasons, we affirm the trial court's judgment of sentence.

¶ 36 Affirmed.

---

**12.** Dr. Cochran testified he had ruled out celiac disease as the cause of the malnutrition after he had performed a number of tests on QT. N.T. 7/18/03 at 831–910.