J. A02010/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :     IN THE SUPERIOR COURT OF
                                  :            PENNSYLVANIA

                v.           :

                                  :

DONTE CANNON,               :          No. 1342 EDA 2012

                                  :

             Appellant     :

Appeal from the Judgment of Sentence, March 28, 2012,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0008426-2010

BEFORE: FORD ELLIOTT, P.J.E., OTT AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:**FILED SEPTEMBER 08, 2014**

Appellant challenges the judgment of sentence imposed following his conviction for second degree murder, two counts of robbery, criminal conspiracy, violation of the Uniform Firearms Act ("VUFA"), and possession of an instrument of crime ("PIC"). On March 28, 2012, immediately following his conviction, appellant was sentenced to life imprisonment for second degree murder, and concurrent sentences of 10 to 20 years for each robbery, 10 to 20 years for criminal conspiracy, 2½ to 5 years on the VUFA, and 2½ to 5 years on the PIC. We affirm.

The facts, as summarized by the trial court, are as follows:

> Police Officer Eric Riddick testified that on January 23, 2010, at approximately 10:00 P.M., he and his partner responded to a report of gunshots on the 5500 block of Beaumont Street in Philadelphia. He saw two women, later identified as Diane Stewart

---

* Retired Senior Judge assigned to the Superior Court.

and Shande Stewart, exit 5537 Beaumont Street and walk towards his patrol car. Shande Stewart told Officer Riddick that an incident had occurred on the block. Officer Riddick got out of his patrol car to inspect the area. He saw a male, later identified as Philippe Koukoui, lying face-down with a gunshot wound to the back of his head and to the back part of his neck in the back of a vacant lot at 5527 Beaumont Street. Officer Riddick went through the backpack that had been removed from the male's body and recovered a Comcast bill addressed to Philippe Koukoui; a scale; a cell phone; Ziploc baggies; and, a small amount of marijuana. He walked across the street to where there was a smaller vacant lot at 5531 Beaumont Street and recovered three shell casings. Officer Riddick then entered an alleyway that ran behind Beaumont Street and Litchfield Street where he recovered a black patent leather Nike sneaker.

While at the scene, Officer Riddick was approached by a male who identified himself as James Henderson. Henderson told Officer Riddick that he had been the victim of a robbery and that he had been with Philippe Koukoui, hereinafter referred to as the decedent, and Shande Stewart. Henderson was transported to the Homicide Unit to be interviewed.

James Henderson testified that the decedent had been his friend for five (5) to six (6) years. He testified that on January 23, 2010, he went with the decedent to the 5500 block of Beaumont to visit Shande Stewart, whom the decedent knew, and to smoke marijuana. The decedent and Henderson went into Shande Stewart's house and stayed for approximately ten (10) minutes. The decedent, Henderson and Shande Stewart then left the house to walk to a nearby store. They walked down Beaumont Street towards 55th Street. Henderson was walking in the street, ahead of the decedent and Shande Stewart, talking on his cell phone. A male pointing a gun jumped out at Henderson, grabbed him, and started going through his pockets.

Henderson looked back toward where the decedent and Shande Stewart were walking and saw that another male had grabbed the decedent and had a gun pointed at him. The male that was holding Henderson told him to turn around, not to look back, and to run through an alleyway towards 56th Street. He heard Shande Stewart say, "Oh, my God, what's going on". As he was running through the alley, he heard gunshots. His sneaker came off as he was running. When he reached the end of the alley, he heard more gunshots. He went to his house, put on another pair of sneakers and then walked back to [the] scene. He saw the police and told them that he and his friend were just robbed.

Henderson gave a statement wherein he described the male that pointed the gun at him and robbed him as a boy, about 17 or 18 years old, approximately 5'6" tall, skinny, light skinned, wearing a tan snap cap with a brim that was pulled down to his eyes and a black hoodie. In his statement Henderson indicated that the gun that was pointed at him was silver, but he did not know if it was a revolver or an automatic. At trial, he testified that he did not remember giving those answers.

Shande Stewart testified that she knew the decedent from buying marijuana from him on two (2) occasions. She knew his cell phone number and had stored his number in her cell phone. On January 23, 2010, she called the decedent. She wanted to buy five (5) bags of marijuana for $20.00. The decedent came to her house at 5537 Beaumont Street with another male approximately ten (10) minutes later.

Shande Stewart further testified that before she called the decedent, the Defendant was in her house and she had a conversation with him about robbing the decedent. She heard the Defendant make a telephone call after which the Co-Defendant, Aaron McCallum, aka "Beano" came to her house. While sitting in the living room of her house, Shande Stewart, the Defendant and Co-Defendant

talked about robbing the decedent. The Defendant and Co-Defendant told her to call the decedent and tell him that she wanted five (5) for $10.00. The Defendant and Co-Defendant told her that they were going to be in the basement of the house and were going to leave the house from the back door in the basement to rob the decedent. The decedent called and told her he was outside of her house. She let the decedent and Henderson into the house. The decedent told her he was not going to sell her the marijuana for the price she asked. Shande Stewart, Henderson and the decedent then left the house through the front door and walked down Beaumont Street towards 55th Street. She then saw the Defendant come out of a vacant lot located at 5527 Beaumont Street. The Co-Defendant came out from the other side of the street. The Defendant was holding a gun and grabbed the decedent by his shirt. The Co-Defendant was holding a gun and grabbed Henderson by his shirt. She ran towards her house. Henderson was running and the Co-Defendant shot at him. As she ran inside her house, she heard more gunshots. She ran down to the basement where she saw the Defendant and the Co-Defendant. She heard the Defendant say, "I think the boy is dead". She ran upstairs and told her mother that that [sic] the boys she was with were robbed. She then went outside with her mother and saw a police car coming down the street. She told the police that she had heard the gunshots. She was transported to Homicide for investigation.

At the Homicide Division, Shande Stewart told the detectives about the robbery and the Defendant's and Co-Defendant's involvement. She consented to a search of her cell phone. She was then taken into custody.

On April 27, 2011, Shande Stewart entered into a Memorandum of Agreement with the District Attorney's Office wherein she would plead to two (2) counts of robbery and conspiracy and the murder charge would be ***nolle prossed***. At the time of trial, she had not yet been sentenced.

Detective Timothy Bass testified that based on information received from Shande Stewart, he went to 5537 Beaumont Street and transported the Defendant to the Homicide Division. Detective Bass took the Defendant's statement. In his statement, the Defendant told Detective Bass in summary: that he did not know the decedent or James Henderson; that he and the Co-Defendant talked about robbing the two (2) men; that Shande Stewart called him and told him that the two (2) males they were going to rob did not carry guns; and, that he knew the Co-Defendant probably had a gun. He indicated further that: he was in the house with Shande Stewart and the Co-Defendant when the two (2) men came to Shande Stewart's house. He followed one of the two men outside; grabbed him; and, started fighting with him. He got two (2) cigarettes from the male he robbed. He saw that the other male had a backpack and saw that male try to run away from the Co-Defendant who was standing at the end of the lot. He heard four (4) to five (5) gunshots. The Defendant further indicated that after the incident, the Co-Defendant called him and asked him if anyone was shot; the Defendant told him that somebody was dead. The Defendant told the Co-Defendant that detectives were at his aunt's house. The Co-Defendant told him that he was going on the run.[Footnote 1]

> [Footnote 1] When the statement was read to the jury, references to the Co-Defendant were redacted and read as "the other guy". Also, prior to the statement being read, the trial court cautioned the jury that the statement could be used as evidence only against the Defendant.

Detective Bass testified that the cell phones of Shande Stewart, the Defendant and the decedent were recovered. The Co-Defendant was arrested on June 22, 2011.

Corey Williams testified that he has known the Co-Defendant for more than ten (10) years. On January 23, 2010, he was with the Co-Defendant when the Co-Defendant received a phone call from "Star", who Williams later identified as Shande Stewart. The Co-Defendant told him that he was going to walk to Shande Stewart's house to do a "mission". The Co-Defendant was gone for approximately twenty (20) minutes. When the Co-Defendant returned, he admitted to Corey Williams what had occurred and a male was dead.

Williams testified that he had seen the Co-Defendant with guns on multiple occasions and that the last gun he saw the Co-Defendant with was a chrome and black semi-automatic.

Dr. Gulino, Chief Medical Examiner for the City of Philadelphia, testified that the decedent had suffered three (3) gunshot wounds: one gunshot wound entered his head in the left back; the second was a through and through gunshot wound of the right arm which fractured the humerus; the third was a graze wound along the back of the neck. Dr. Gulino opined that the decedent died as a result of a gunshot wound to the head and the manner of death was homicide.

Dr. Gulino testified that hypothetically the gunshot wound to the back of the decedent's head was consistent with the decedent being in a squatting position and the shooter standing behind the decedent, pointing the gu[n] down towards the back of the decedent's head; and, that the graze wound to the decedent's head was consistent with his head being forward and pointed at the ground.

Detective Christopher Tankelewicz testified that he is the director of the Philadelphia District Attorney's Office Technical Services Unit; and, that his unit handles computer forensics, cell phone forensics, audio and video forensics. Detective Tankelewicz testified that he extracted

information from Shande Stewart's cell phone on February 7, 2011. That information provided that on January 23, 2010, at 9:54:21 P.M., Shande Stewart texted the Co-Defendant a message that read, "They about to come out".

Officer Gregory Welsh, assigned to the Firearms Identification Unit testified that the three (3) 9 mm Luger fired cartridge casings recovered from the scene were fired from the same firearm. He testified that he examined the bullets that were turned over to his unit by the Medical Examiner's Office. One (1) of the bullets was recovered from the base of the decedent's skull; the other bullet was found mixed in with the decedent's clothing. He testified that it was possible that the three (3) fired cartridge casings and the two (2) bullets were fired by the same gun.

Trial court opinion, 3/17/13 at 2-8.

Appellant and his co-defendant, Aaron McCallum, were tried before a jury. The trial began on March 21, 2012, and concluded on March 28, 2012. Both men were found guilty of the aforementioned charges.[1] A third co-defendant, Shande Stewart, in return for her cooperation, had murder charges withdrawn; she pled guilty to robbery charges. Post-trial motions were filed and subsequently denied. Appellant complied with the trial court's order to file a Rule 1925(b) statement. Appellant raises five issues on appeal. We will begin with appellant's challenge to the sufficiency and weight of the evidence.

---

[1] McCallum filed a direct appeal with this court docketed at No. 1464 EDA 2012. On June 9, 2014, this court affirmed McCallum's judgment of sentence.

Appellant challenges the sufficiency of the evidence to convict him. Specifically, he claims he was not present and did not commit the crimes. Appellant contends the evidence was inconsistent, conflicting, and insufficient. (Appellant's brief at 47.)

> In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to determine whether there is sufficient evidence to enable the factfinder to find every element of the crime established beyond a reasonable doubt. **Commonwealth v. Thomas**, 867 A.2d 594 (Pa.Super.2005). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." **Id.** at 597. And while a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty. **Id.** quoting **Commonwealth v. Coon**, 695 A.2d 794, 797 (Pa.Super.1997). This Court is not free to substitute its judgment for that of the fact-finder; if the record contains support for the convictions they may not be disturbed. **Id.** citing **Commonwealth v. Marks**, 704 A.2d 1095, 1098 (Pa.Super.1997) and **Commonwealth v. Mudrick**, 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986). Lastly, the factfinder is free to believe some, all, or none of the evidence. **Id.**

**Commonwealth v. Hartle**, 894 A.2d 800, 803-804 (Pa.Super. 2006). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. **Commonwealth v. Hopkins**, 747 A.2d 910, 917 (Pa.Super. 2000). Notably, questions concerning inconsistent testimony and improper motive go to the credibility of the witnesses, not the sufficiency of

the evidence. ***Commonwealth v. Davido***, 868 A.2d 431, 442 (Pa. 2005),

***cert. denied***, 546 U.S. 1020 (2005); ***Commonwealth v. DeJesus***, 860

A.2d 102, 107 (Pa. 2004) (holding that questions concerning inconsistent

testimony go to the credibility of the witness, and hence, implicate the

weight, rather than the sufficiency, of the evidence).

Second degree murder is defined as follows:

> A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or as an accomplice in the perpetration of a felony.

18 Pa.C.S.A. § 2502(b).

> A person is guilty of robbery if, in the course of committing a theft, he (1) inflicts serious bodily injury upon another.

18 Pa.C.S.A. § 3701.

Conspiracy is defined as follows:

> (a)    Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> > (1)    Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime;
> >
> > or
> >
> > (2)    Agrees to aid such other person or persons in the planning or commission of such crime or of an

- 9 -

> attempt or solicitation to commit such a crime.

18 Pa.C.S.A. § 903(a).

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa.Super. 2011). The law is well established that circumstantial evidence may provide proof of a conspiracy, and that "an agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Bricker*, 882 A.2d 1008, 1014 (Pa.Super. 2005). However, "a tacit agreement must be established by reasonable inferences arising from the facts and circumstances and not by mere suspicion or conjecture." *Commonwealth v. Savage*, 566 A.2d 272, 276 (Pa.Super. 1989). The law also recognizes that circumstances taken together in context, like an association between alleged conspirators, knowledge of the commission of the crime, presence at the scene of the crime, and/or participation in the object of the conspiracy, may be sufficient to prove a conspiracy when each standing alone is insufficient. *Commonwealth v.*

*Thoeun Tha*, 64 A.3d 704, 710 (Pa.Super. 2013); *Commonwealth v. Swerdlow*, 636 A.2d 1173, 1177 (Pa.Super. 1994).

The crime of possessing an instrument of crime is defined as, "A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907. Appellant was also convicted of VUFA which is defined as follows, "No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in the city of the first class . . ." 18 Pa.C.S.A. § 6108.

Instantly, appellant concedes that the evidence would "normally" be sufficient to support a conviction for felony murder and the related offenses based on Shande Stewart's testimony that there was a planned robbery and appellant participated in the same. (Appellant's brief at 49.) Appellant maintains, however, that the problem in this case is the "highly inconsistent nature of the testimony." (*Id.*) Such a challenge based on inconsistent testimony is a veiled attack on the weight of the evidence. *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000) (an attack on the reliability and credibility of the evidence is a weight claim, not a sufficiency claim).[2]

---

[2]The trial court concluded the evidence was sufficient for a jury to have found that the elements of the crimes charged were proven beyond a reasonable doubt. (Trial court opinion, 3/17/13 at 11.) Viewing the evidence in the light most favorable to the Commonwealth, as our standard of review requires, the evidence along with the testimony presented by the Commonwealth supports appellant's convictions. Admitted into evidence was appellant's signed statement that he and his co-defendant,

Our standard of review for evaluating a weight of the evidence claim is well-established:

> Appellate review of a weight claim ***is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.*** Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained[,] [t]he term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not

---

Aaron McCallum ("McCallum"), conspired to rob the decedent and Henderson and that Shande Stewart called him and told him that the two males they were going to rob did not carry guns. The decedent and Henderson walked into a trap and were ambushed by appellant and McCallum. In the course of the robbery, Henderson fled, gunshots were fired, and the decedent died of multiple gunshot wounds. ***See Commonwealth v. Munchinski***, 585 A.2d 471, 483 (Pa.Super. 1990) (evidence sufficient to establish second degree murder where crime began as a robbery and ended in a homicide).

> merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

**Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis in the original) (citations omitted).

Here, the trial court summarized the testimony as well as the physical evidence, and found that the verdict was not against the weight of the evidence. (Trial court opinion, 3/17/13 at 8-10.) Appellant complains that the testimony of the witnesses was unreliable. "[I]t matters not whether appellant finds a witness's testimony lacking in credibility; such matters are solely within the province of the jury as trier of fact and, as such, will not be assailed on review by this court." **Commonwealth v. Poindexter**, 646 A.2d 1211, 1214 (Pa.Super. 1994), **appeal denied**, 655 A.2d 512 (Pa. 1995).

We discern no abuse of discretion whatsoever in the trial court's careful analysis of the weight of the evidence issue. While appellant asserts that there was no one who identified him as being involved other than Shande Stewart, that testimony, if believed by the fact-finder, is enough. **See Commonwealth v. Kunkle**, 623 A.2d 336 (Pa.Super. 1993) (uncorroborated testimony of a single witness is sufficient for conviction). Indeed, as noted in the trial court's opinion, questions concerning inconsistent testimony and improper motive go to the credibility of the

witnesses. *See Commonwealth v. Holley*, 945 A.2d 241, 246 (Pa.Super. 2004), *appeal denied*, 959 A.2d 928 (Pa. 2008). Based upon the evidence presented, the trial court did not abuse its discretion in denying appellant's weight of the evidence claim.

Next, appellant argues that the trial court abused its discretion in permitting the expert testimony of Detectives Tankelewicz and Glenn. (Appellant's brief at 36.) According to appellant, Detective Tankelewicz was qualified as an expert witness, but Detective Glenn was not. Appellant complains that both were allowed to testify as to the phone records and extraction of information and text messages from the cell phones of appellant, Stewart, and McCallum. (*Id.*)

"The admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion." *Commonwealth v. Page*, 59 A.3d 1118, 1135 (Pa.Super. 2013). Expert testimony is governed by Pa.R.E. 702, which reads,

> **Rule 702.  Testimony by experts**
>
> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

Whether a witness is qualified as an expert is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *See Commonwealth v. Jennings*, 958 A.2d 536, 539 (Pa.Super. 2008). Pennsylvania applies a liberal standard for the qualification of an expert witness. *Commonwealth v. Ramos*, 920 A.2d 1253, 1255 (Pa.Super. 2007). Generally, "in order to be deemed an expert witness, one must only 'possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience.'" *Jennings*, 958 A.2d at 539 (citation omitted). "If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given his evidence is for the jury to determine." *Commonwealth v. Harris*, 703 A.2d 441, 448 (Pa. 1997). "It is also well established that an expert may render an opinion based on training and experience; formal education is not necessarily required." *Ramos*, *supra* at 1256.

Here, the record indicates that there was much discussion concerning whether Detective Tankelewicz should be qualified as an expert in the field of digital forensics with regard to cellular phones. The detective stated his qualifications; for example, he is the Director of the Philadelphia District Attorney's Office Technical Services Unit. (Notes of testimony, 3/26/12 at 128.) He testified that he has over 1,000 hours of training in digital forensics which include several certifications. (*Id.* at 129.) He was also

assigned to the FBI in their Joint Terrorism Task Force for four years. (***Id.*** at 130.)

Appellant focuses on the detective's use of a computer program called Cellebrite in performing his work. (***Id.*** at 136.) According to appellant, the detective indicated that, depending on the make and model of the phone, the computer program did all the work. (***Id.***) The detective testified he was not involved in the making of the computer program, and he could not estimate a percentage of error that might be in the program. (***Id.*** at 143.) Throughout Detective Tankelewicz's testimony, defense counsel raised a continuing objection. Defense counsel claimed that the detective put the device into a computer which resulted in a print-out; essentially, there was no expertise involved. (***Id.*** at 149-150.)

The record indicates that the trial court initially allowed Detective Tankelewicz to be qualified as an expert. (***Id.*** at 129, 150.) During the next day of the trial, during a sidebar discussion with counsel, the trial court stated, "I am not going to call [Detective Tankelewicz] an expert, either. [Although] I think he had more training [than Detective Glenn]." (Notes of testimony, 3/27/12 at 17-18.) During jury instructions, the trial court stated:

> I have permitted Dr. Gulino, Police Officer Welsh [to testify]. Dr. Gulino is a medical examiner. Police Officer Welsh is the Firearms Identification Unit ballistics expert, and Police Officer Tankelewicz to testify as expert witnesses. Now, I have to say that you heard some back and forth about

- 16 -

> Police Officer Tankelewicz, because it's a new science, you know. They download these cell phones. I permitted him to testify as an expert. Police Officer Tankelewicz, because he had some -- he had some knowledge about this new technology and he knows the words and, you know, how it's done. However, I do want to caution you that he plugged the phone into the computer and the information was printed out. He didn't have to do any interpretation of that information, and he didn't present you with an opinion as the other experts did. They both gave opinions.

Notes of testimony, 3/28/12 at 48-49.

As Detective Tankelewicz did not offer any expert opinion, but merely presented the data that he had downloaded from a cell phone, we see no prejudice to appellant by allowing his testimony. Detective Glenn was not qualified as an expert and merely testified regarding the information that was extracted from appellant's cell phone. (Notes of testimony, 3/27/12 at 23-66.). We see no error here.

Appellant argues that during the Commonwealth's closing argument, the assistant district attorney repeatedly showed the autopsy photograph of decedent's head and this was error. We review claims of prosecutorial misconduct according to the following standard:

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. Even if the prosecutor's arguments are

> improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

*Commonwealth v. Bedford*, 50 A.3d 707, 715–716 (Pa.Super. 2012) (internal citations and quotations omitted).

According to appellant, the prosecutor had no valid reason for showing the photo because there was no dispute as to the cause of death. The Commonwealth argues it was proper to show the photograph because the photo had been admitted into evidence and was used to show the track of the bullet that killed the decedent. Our review of the record reveals that the photograph, the Commonwealth's Exhibit No. 37, was properly admitted into evidence and published to the jury. (Notes of testimony, 3/26/12 at 111.) We see no error in the prosecution calling attention to properly admitted evidence.

Appellant argues the testimony of Corey Williams regarding statements made by co-defendant McCallum was inadmissible and prejudicial. He acknowledges, however, that the statement was redacted in compliance with *Bruton v. U.S.*, 391 U.S. 123 (1968).

We will not disturb a trial court's admission of evidence unless we find the admission was an abuse of discretion. *Commonwealth v. Hardy*, 918 A.2d 766, 776 (Pa.Super. 2007). An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill-will, partiality, prejudice, manifest

unreasonableness, or a misapplication of law. ***Commonwealth v. Hacker***, 959 A.2d 380, 392 (Pa.Super. 2008).

During trial, the Commonwealth called Corey Williams, who identified himself as a friend of co-defendant McCallum. (Notes of testimony, 3/26/12 at 75.) According to Williams, he had been hanging out with McCallum and some other people when McCallum received a phone call from "some girl" and then announced "he was going on a mission." (***Id.*** at 77.) Williams explained the term "going on a mission" meant doing something "we ain't have no business doing." (***Id.***) Williams testified McCallum was gone for "twenty minutes to a half-hour." (***Id.*** at 81.) Williams was asked to explain what McCallum said when he returned to the house. He stated that McCallum told him:

> [McCallum] was waiting for the guy to come. The guys came. He hopped out on the guys. One guy took off. Shots got fired. The other guy, he got grabbed, he got threw [sic] to the ground. Shots got fired. He ended up dead. That's the story.

***Id.*** at 82-83.

Williams was asked if McCallum mentioned the name of the girl who called him, and he replied, "[McCallum] said he was on the phone with Star and he was getting ready to walk around her house to do a mission." (***Id.*** at 84.) Williams did not know Star's real name but later identified her from a police photo. (***Id.*** at 85-86.) The name connected to the photo was

Shande Stewart.  (*Id.* at 86.)  During his testimony, Williams never mentioned appellant's name.

Appellant argues Williams' statement interlocked with the facts and prejudiced the jury against appellant.  He also claims that the statement was hearsay and in violation of the right to confront a witness.  Our review indicates there is no merit to appellant's argument.  The trial court has addressed the issue in its opinion and we will adopt its discussion as our own.  (*See* trial court opinion, 3/17/13 at 12-13.)

Accordingly, finding no merit to any of appellant's arguments, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/8/2014

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :
      V.                          : CP 51 CR 0008426 2010
DONTE CANNON            :

**FILED**

MAR 7 2013

Criminal Appeals Unit
First Judicial District of PA

**OPINION**

DeFino-Nastasi, J.

**PROCEDURAL HISTORY**

On March 29, 2012, the Defendant and his Co-Defendant, (Aaron McCallum), were convicted of Murder of the Second Degree; two (2) counts of Robbery; Conspiracy; Violation of the Uniform Act section 6108 (VUFA 6108) and Possession of an Instrument of Crime (PIC).

On that same date, the Defendant was sentenced to life without the possibility of parole for the murder conviction; ten (10) to twenty (20) years' incarceration for each of the robbery convictions; ten (10) to twenty (20) years' incarceration for the conspiracy conviction; two and one-half (2½) to five (5) years' incarceration on the VUFA 6108 and PIC convictions. All sentences to run concurrently.

On April 30, 2012, the court denied the Defendant's post-trial motions.

On May 9, 2012, the Defendant filed a notice of appeal to the Superior Court.

On August 22, 2012, pursuant to an order of the court, the Defendant filed a 1925(b) statement claiming that:

1. The verdict was against the weight of the evidence.

2. The evidence was insufficient to support the verdict.

3. The court erred in not severing the Defendant's and Co-Defendant's cases.

4. The court erred in admitting Corey Williams' statement.

5. ADA erred in his closing speech to the jury on several occasions by giving his personal opinion (as to) the credibility of key Commonwealth witnesses and

Exhibit "A"

facts, and, the ADA erred in giving testimony about the reasons for the plea agreement (with) Ms. Stewart.

6. The court erred in not granting a mistrial when the ADA erred by showing autopsy photos of the wounds to the back of the head of the victim during his closing argument.

7. The court erred in introducing the forensic reports of Shande Stewart's and Donte Cannon's phone records.

8. The Defendant was denied his right to a public trial when his family and friends were denied the right to enter in the courtroom during two (2) of the closing speeches.

## FACTS

Police Officer Eric Riddick testified that on January 23, 2010, at approximately 10:00 P.M., he and his partner responded to a report of gunshots on the 5500 block of Beaumont Street in Philadelphia. He saw two women, later identified as Diane Stewart and Shande Stewart, exit 5537 Beaumont Street and walk towards his patrol car. Shande Stewart told Officer Riddick that an incident had occurred on the block. Officer Riddick got out of his patrol car to inspect the area. He saw a male, later identified as Philippe Koukoui, lying face-down with a gunshot wound to the back of his head and to the back part of his neck in the back of a vacant lot at 5527 Beaumont Street. Officer Riddick went through the backpack that had been removed from the male's body and recovered a Comcast bill addressed to Philippe Koukoui; a scale; a cell phone; Ziploc baggies; and, a small amount of marijuana. He walked across the street to where there was a smaller vacant lot at 5531 Beaumont Street and recovered three shell casings. Officer Riddick then entered an alleyway that ran behind Beaumont Street and Litchfield Street where he

2

recovered a black patent leather Nike sneaker.

While at the scene, Officer Riddick was approached by a male who identified himself as James Henderson. Henderson told Officer Riddick that he had been the victim of a robbery and that he had been with Philippe Koukoui, hereinafter referred to as the decedent, and Shande Stewart. Henderson was transported to the Homicide Unit to be interviewed. (Notes of Testimony, Trial (Jury), Volume 1, March 21, 2012, pages 131, 137-141,144,147).

James Henderson testified that the decedent had been his friend for five (5) to six (6) years. He testified that on January 23, 2010, he went with the decedent to the 5500 block of Beaumont to visit Shande Stewart, whom the decedent knew, and to smoke marijuana. The decedent and Henderson went into Shande Stewart's house and stayed for approximately ten (10) minutes. The decedent, Henderson and Shande Stewart then left the house to walk to a nearby store. They walked down Beaumont Street towards 55th Street. Henderson was walking in the street, ahead of the decedent and Shande Stewart, talking on his cell phone. A male pointing a gun jumped out at Henderson, grabbed him, and started going through his pockets. Henderson looked back toward where the decedent and Shande Stewart were walking and saw that another male had grabbed the decedent and had a gun pointed at him. The male that was holding Henderson told him to turn around, not to look back, and to run through an alleyway towards 56th Street. He heard Shande Stewart say, "Oh, my God, what's going on". As he was running through the alley, he heard gunshots. His sneaker came off as he was running. When he reached the end of the alley, he heard more gunshots. He went to his house, put on another pair of sneakers and then walked back to scene. He saw the police and told them that he and his friend were just robbed. (Notes of Testimony, Trial (Jury) Volume 2, March 22, 2012, page 58 - 65, 135).

3

Henderson gave a statement wherein he described the male that pointed the gun at him and robbed him as a boy, about 17 or 18 years old, approximately 5'6" tall, skinny, light skinned, wearing a tan snap cap with a brim that was pulled down to his eyes and a black hoodie. In his statement Henderson indicated that the gun that was pointed at him was silver, but he did not know if it was a revolver or an automatic. At trial, he testified that he did not remember giving those answers. (NT, id, pages 78 – 81).

Shande Stewart testified that she knew the decedent from buying marijuana from him on two (2) occasions. She knew his cell phone number and had stored his number in her cell phone. On January 23, 2010, she called the decedent. She wanted to buy five (5) bags of marijuana for $20.00. The decedent came to her house at 5537 Beaumont Street with another male approximately ten (10) minutes later. (NT, id, pages 147 – 151).

Shande Stewart further testified that before she called the decedent, the Defendant was in her house and she had a conversation with him about robbing the decedent. She heard the Defendant make a telephone call after which the Co-Defendant, Aaron McCallum, aka "Beano" came to her house. While sitting in the living room of her house, Shande Stewart, the Defendant and Co-Defendant talked about robbing the decedent. The Defendant and Co-Defendant told her to call the decedent and tell him that she wanted five (5) for $10.00. The Defendant and Co-Defendant told her that they were going to be in the basement of the house and were going to leave the house from the back door in the basement to rob the decedent. The decedent called and told her he was outside of her house. She let the decedent and Henderson into the house. The decedent told her he was not going to sell her the marijuana for the price she asked. Shande Stewart, Henderson and the decedent then left the house through the front door and walked down Beaumont Street towards 55th Street. She then saw the Defendant come out of a vacant lot

4

located at 5527 Beaumont Street. The Co-Defendant came out from the other side of the street. The Defendant was holding a gun and grabbed the decedent by his shirt. The Co-Defendant was holding a gun and grabbed Henderson by his shirt. She ran towards her house. Henderson was running and the Co-Defendant shot at him. As she ran inside her house, she heard more gunshots. She ran down to the basement where she saw the Defendant and the Co-Defendant. She heard the Defendant say, "I think the boy is dead". She ran upstairs and told her mother that that the boys she was with were robbed. She then went outside with her mother and saw a police car coming down the street. She told the police that she had heard the gunshots. She was transported to Homicide for investigation. (Notes of Testimony, Trial (Jury) Volume 2, March 22, 2012, pages 152 – 180).

At the Homicide Division, Shande Stewart told the detectives about the robbery and the Defendant's and Co-Defendant's involvement. She consented to a search of her cell phone. She was then taken into custody. (NT, id, pages 181 - 187).

On April 27, 2011, Shande Stewart entered into a Memorandum of Agreement with the District Attorney's Office wherein she would plead to two (2) counts of robbery and conspiracy and the murder charge would be *nolle prossed*. At the time of trial, she had not yet been sentenced. (NT, id, pages 187 – 193).

Detective Timothy Bass testified that based on information received from Shande Stewart, he went to 5537 Beaumont Street and transported the Defendant to the Homicide Division. Detective Bass took the Defendant's statement. In his statement, the Defendant told Detective Bass in summary: that he did not know the decedent or James Henderson; that he and the Co-Defendant talked about robbing the two (2) men; that Shande Stewart called him and told him that the two (2) males they were going to rob did not carry guns; and, that he knew the Co-

5

Defendant probably had a gun. He indicated further that: he was in the house with Shande Stewart and the Co-Defendant when the two (2) men came to Shande Stewart's house. He followed one of the two men outside; grabbed him; and, started fighting with him. He got two (2) cigarettes from the male he robbed. He saw that the other male had a backpack and saw that male try to run away from the Co-Defendant who was standing at the end of the lot. He heard four (4) to five (5) gunshots. The Defendant further indicated that after the incident, the Co-Defendant called him and asked him if anyone was shot; the Defendant told him that somebody was dead. The Defendant told the Co-Defendant that detectives were at his aunt's house. The Co-Defendant told him that he was going on the run. (Notes of Testimony, Trial (Jury) Volume 3, March 23, 2012, pages 185 – 209).[1]

Detective Bass testified that the cell phones of Shande Stewart, the Defendant and the decedent were recovered. The Co-Defendant was arrested on June 22, 2011. (Notes of Testimony, Trial (Jury), Volume 4, March 26, 2012, pages 10 – 11).

Corey Williams testified that he has known the Co-Defendant for more than ten (10) years. On January 23, 2010, he was with the Co-Defendant when the Co-Defendant received a phone call from "Star", who Williams later identified as Shande Stewart. The Co-Defendant told him that he was going to walk to Shande Stewart's house to do a "mission". The Co-Defendant was gone for approximately twenty (20) minutes. When the Co-Defendant returned, he admitted to Corey Williams what had occurred and a male was dead.

Williams testified that he had seen the Co-Defendant with guns on multiple occasions and that the last gun he saw the Co-Defendant with was a chrome and black semi-automatic. (NT, id, pages 73 – 88).

---

[1] When the statement was read to the jury, references to the Co-Defendant were redacted and read as "the other guy". Also, prior to the statement being read, the trial court cautioned the jury that the statement could be used as evidence only against the Defendant.

6

Dr. Gulino, Chief Medical Examiner for the City of Philadelphia, testified that the decedent had suffered three (3) gunshot wounds: one gunshot wound entered his head in the left back; the second was a through and through gunshot wound of the right arm which fractured the humerus; the third was a graze wound along the back of the neck. Dr. Guilino opined that the decedent died as a result of a gunshot wound to the head and the manner of death was homicide. (NT, id, pages 110 – 112).

Dr. Gulino testified that hypothetically the gunshot wound to the back of the decedent's head was consistent with the decedent being in a squatting position and the shooter standing behind the decedent, pointing the guy down towards the back of the decedent's head; and, that the graze wound to the decedent's head was consistent with his head being forward and pointed at the ground. (NT, id, pages 118 – 120).

Detective Christopher Tankelewicz testified that he is the director of the Philadelphia District Attorney's Office Technical Services Unit; and, that his unit handles computer forensics, cell phone forensics, audio and video forensics. (NT, id, page 128). Detective Tankelewicz testified that he extracted information from Shande Stewart's cell phone on February 7, 2011. That information provided that on January 23, 2010, at 9:54:21 P.M., Shande Stewart texted the Co-Defendant a message that read, "They about to come out". (NT, id, page 160).

Officer Gregory Welsh, assigned to the Firearms Identification Unit testified that the three (3) 9 mm luger fired cartridge casings recovered from the scene were fired from the same firearm. He testified that he examined the bullets that were turned over to his unit by the Medical Examiner's Office. One (1) of the bullets was recovered from the base of the decedent's skull; the other bullet was found mixed in with the decedent's clothing. He testified that it was possible that the three (3) fired cartridge casings and the two (2) bullets were fired by

7

the same gun. (NT, id, pages 196, 199, 207, 224).

## ANALYSES

The Defendant first claims that the verdict was against the weight of the evidence and that the evidence was insufficient to support the verdict.

The Defendant claims that James Henderson did not identify him or the Co-Defendant. He claims that James Henderson's testimony was not supported by physical evidence, in that his foot was not cut, there was no evidence of a shooting at him; and, that he left the scene without calling for help.

The Defendant claims that Shande Stewart's testimony was contradictory in that she originally told the police that she and her friends were robbed by two black men she did not know later changed her story to say it was the Defendant and Co-Defendant. Finally, at trial she testified inconsistently as to both her statements. Additionally, she was inconsistent in that she said at one point that the Defendant was inside the house with her when the shots were fired.

The Defendant misconstrues the testimony when he states that Ms. Stewart testified that the Defendant was in the house with her when the shots were fired. She clearly testified that the Defendant was outside.

Furthermore, James Henderson's testimony and Shande Stewart's testimony were corroborated by the Defendant's statement to Detective Bass. Henderson's inability to identify the Defendant or Co-Defendant is of no moment in light of the overwhelming evidence of Shande Stewart's identification testimony and the overwhelming circumstantial evidence. The Defendant's statement also corroborated Shande Stewart's testimony that the Defendant was in the house with Shande Stewart and the Co-Defendant when the two (2) men came to her house; that he followed one of the two men; and, grabbed the man. His statement also corroborated the

8

physical evidence that the Defendant saw the decedent with a backpack. In his statement the Defendant indicated that after the incident, when the Co-Defendant called him and asked him if anyone was shot, the Defendant told him that somebody was dead.

Corey Williams' testimony corroborated the testimony of Henderson, Shande Stewart and the statement that the Defendant provided to the police. His testimony was that on January 23, 2010, the Co-Defendant received a phone call from Shande Stewart; that the Co-Defendant told him that he was going to walk to Shande Stewart's house to do a "mission"; and that after the Co-Defendant returned, he told Williams that after waiting on Beaumont Street for males to come, when the males came, he jumped out on one of the males; shots were fired; and, that one male ended up dead.

Mr. Henderson's testimony that his sneaker came off as he was running away down the alleyway was corroborated by the physical evidence. Detective Riddick testified that he recovered a sneaker from the alleyway and Mr. Henderson identified the sneaker as his.

Furthermore, Mr. Henderson was cross-examined thoroughly as to why he did not sustain any injury to his foot when he lost his sneaker. (Notes of Testimony, March 22, 2012, pages 102 – 103.

The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence; and to assess the credibility of the witnesses and that "questions concerning inconsistent testimony and improper motive go to the credibility of the witnesses". *Commonwealth v. Holley*, 2008 PA Super 44, 945 A.2d 241, 246 (Pa. Super. 2008) (citing *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102 (Pa. 2004).

Shande Stewart's testimony was also supported by the physical evidence. The marijuana and packaging material found in the decedent's backpack corroborated her testimony that she

9

had called the decedent to buy marijuana from him.

Furthermore, the evidence showed that on January 23, 2010, at 9:54:21 P.M., Shande Stewart texted the Co-Defendant a message that read, "They about to come out". This evidence corroborated her testimony that she, the Defendant and the Co-Defendant conspired to rob the decedent and Henderson.

It is well settled law that:

> A trial court will grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. Although a new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Appellate review, therefore, is a review of the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. *Commonwealth v. Lloyd*, 2005 PA Super 236, (Pa. Super. Ct. 2005) (internal citations and quotations omitted).

In the present case, it is clear that the verdict was not so contrary to the evidence as to shock one's sense of justice. Therefore, the court did not abuse its discretion in finding that verdict was not against the weight of the evidence.

It is also well-settled law that:

> On a challenge to the sufficiency of the evidence to support a conviction, we

10

review the evidence admitted at trial, along with any reasonable inferences that may be drawn from that evidence, in the light most favorable to the verdict winner. A conviction will be upheld if after review we find that the jury could have found every element of the crime beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may prove each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Furthermore, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence. *Commonwealth v. Lloyd*, id.

It is also clear that the evidence admitted at trial, along with reasonable inferences drawn from that evidence, viewed in the light most favorable to the Commonwealth, was sufficient for a jury to have found that every element of the crimes was proven beyond a reasonable doubt. Therefore, this claim is without merit.

The Defendant next claims that court erred in not severing the cases of the Defendant and Co-Defendant.

The court's ruling on the severance motion can be found on pages 11 – 13, Notes of Testimony, Motion, Volume I, February 7, 2012.

11

The Defendant next claims that the court erred in admitting Corey Williams' statement. The Defendant acknowledges that the court gave a cautionary instruction that Mr. Williams' statement could only be used against the Co-Defendant; however, the Defendant claims that Mr. Williams' statement interlocked with the facts and prejudiced the jury against the Defendant. He also claims that the statement was rank hearsay and in violation of the right to confront a witness.

Hearsay is defined as: "…a statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted". Pa.R.E. 801. Hearsay is not admissible, unless one of the exceptions set forth in Pa.R.E. 803 is applicable.

In this case, the Defendant claims that the statement the Co-Defendant made to Corey Williams was inadmissible hearsay. The Pennsylvania Rules of Evidence clearly demonstrates otherwise. The Co-Defendant's statement falls into the exception of an admission by a party-opponent, in that it is the Co-Defendant's own statement that is being admitted against him. Pa.R.E. 803(25). Moreover, as the Co-Defendant may be technically "unavailable", pursuant to Pa.R.E. 804, the statement is admissible as a statement against interest, under subsection (b)(3), in that the statement, when it was made, was contrary to the Co-Defendant's criminal liability. Accordingly, the statement that the Co-Defendant made to Corey Williams was properly admitted.

Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness "against" a defendant if the jury is instructed to consider that testimony only against a co-defendant. This accords with the almost invariable assumption of the law that jurors follow their instructions. *Commonwealth v. Travers*, 564 Pa. 362, 366 (Pa. 2001).

The Supreme Court considered this practice in *Richardson v Marsh*, 481 U.S. at 200, 107 S. Ct. at 1702. In *Richardson*, the co-defendant's confession was redacted to remove all reference

12

to the defendant, and the jury was specifically instructed to consider the confession only against the co-defendant. The defendant argued that, despite the redaction, admission of the co-defendant's confession violated her confrontation rights because it implicated her in the crime when linked with other evidence. The Court expressly rejected the theory of contextual implication, recognizing the important distinction between co-defendant confessions that expressly incriminate the defendant and those that become incriminating only when linked to other evidence properly introduced at trial. When incrimination is merely inferential, the court noted, "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." Linking the Defendant to the crime with other properly admitted evidence is not a violation of the Bruton rule; it is a permissible instance of contextual implication. *Commonwealth v. Travers*, id. Therefore, this claim is without merit.

The Defendant next claims that the ADA erred in his closing speech to the jury on several occasions by giving his personal opinion as to the credibility of key Commonwealth witnesses and facts; giving testimony during his closing speech about the reasons for the plea agreement to Ms. Stewart; and, talking about evidence not on record.

> A prosecutor's arguments to the jury are generally not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. A prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present arguments with logical force and vigor. The prosecutor is also permitted to respond to defense arguments. Finally, in order to evaluate whether the comments were improper, we do not look at the comments

13

in a vacuum; rather we must look at them in the context in which they were made. *Commonwealth v. May*, 587 Pa. 184, 898 A.2d 559 (2006), cert. denied, 549 U.S. 1022, 127 S. Ct. 557, 166 L. Ed. 2d 414 (2006).

Defense counsel objected after the Assistant District Attorney (ADA) made the following comment:

MR. DAVIS: One thing that you have to consider is this idea that she got a deal. Did she get a deal. Did she make a deal. Yes, she made a deal. If you have some unsettled feelings or problems or issues with that, the fact that I am a representative of the District Attorney's Office, I am the one prosecuting this case, that I allowed her to plead guilty to two counts of robbery for James Henderson and Philippe Koukoui and one count of conspiracy to commit robbery, hold that against me. That's a decision that a prosecutor makes. It's a considerable power. It can be a little intimidating sometimes to make a decision like that, to evaluate a Shande Stewart, who she is and what her level of responsibility was that night and to make that decision.

MR. STRETTON: Objection. Giving testimony. It's not of record.

THE COURT: Sustained.

(Notes of Testimony, Trial (Jury) Volume 1, March 27, 2012, pages 207 – 208).

The Defendant's objection appears to refer to the ADA's comment regarding how difficult it was to offer the deal to Shande Stewart.[2] The ADA's comment was in fair response to the defense counsel's comments made during his closing argument as to Shande Stewart's "deal". See e.g., Notes of Testimony, March 27, 2012, page 158, "she got the deal of a lifetime",

---

[2] Shande Stewart's Memorandum of Agreement with the Commonwealth was thoroughly examined on direct and cross-examination. (Notes of Testimony, Trial (Jury) Volume 2, March 22, 2012, pages 189 – 196, 247 – 252).

14

page 181, "the extent of her cooperation and the recommendation of the sentence is going to come from him (the ADA)"; page 189, "they have made deals with people who are totally unreliable, who are totally uncooperative". The ADA's argument was fair response to defense counsel questioning and argument regarding Ms. Stewart's Memorandum of Agreement.

Defense counsel objected after the ADA made the following comment:

MR. DAVIS: If Mr. Henderson -- first of all, his actions that night completely betrayed that to be ridiculous, right. If you were involved like that, why are you going back to the scene 20 minutes later literally rolling right into the lion's den. Here I am. I set up my friend. I am going to come back and say hi to some police officers. Ridiculous. But beyond that, he sat in this chair just like he sat in the chair at the preliminary hearing, and he looked out into the courtroom seeing some folks from the neighborhood, I guess, because this is right where he lives. This is right where he lives.

MR. STRETTON: Objection.

MR. PATRIZIO: Objected to, Judge.

MR. STRETTON: Move for mistrial.

THE COURT: Sustained. Mistrial denied.

(Notes of Testimony, March 27, 2012, page 210)

The ADA's comment was fair response to defense counsel's comments regarding Mr. Henderson's ability to remember the events of that evening and Mr. Henderson's actions on the night of the murder. Co-Defendant's counsel argued, "He is a strange character. His best friend or his good friend is shot and killed earlier, according to him or he sees him or hears or thinks something's happening. He runs away. He says he is pistol whipped and runs for the lot, even

15

loses his sneaker, .... Mr. Henderson's testimony. It doesn't make any sense." (Notes of Testimony, March 27, 2012, page 150, 140 - 141).

Defense counsel's made two (2) objections to the ADA's closing that appear on page 220 and 239 of the Notes of Testimony, March 27, 2102. The objections appear following the ADA's comments:

MR. DAVIS : What other evidence do you have in the case. Well, Donte Cannon gave a confession. I mentioned it to you before the trial started. It's not the whole truth, and nothing but the truth.

MR. STRETTON: Objection.

THE COURT: Overruled. It's argument.

(Notes of Testimony, March 27, page 220).

MR. DAVIS: I am going to turn finally to these phone records. Because just like that brutally honest evidence, this, it cannot lie. It cannot lie.

MR. STRETTON: Objection to personal opinions repeatedly. Move for a mistrial.

THE COURT: Overruled. It's argument. Denied.

MR. DAVIS: I am just trying to argue what I think the evidence shows you.

(Notes of Testimony, March 27, 2012, page 239.

As a general rule, a prosecutor is free to argue the reasonable inferences supported by the record. A prosecutor may not, however, interject his personal opinion regarding the credibility of any witness, including the accused, nor may he argue facts which may be within his personal knowledge but which are not of record. Although the prosecutor may not assert his personal belief as to the guilt or innocence of the accused, the prosecutor may argue that the evidence

16

proves the defendant guilty as charged. *Commonwealth v. Gunderman*, 268 Pa. Super. 142, 407 A.2d 870. (internal citations omitted).

Consequently, while "a prosecutor must limit his statements to the facts introduced at trial and the legitimate inferences therefrom, and may not inject his personal opinion of a defendant's credibility into evidence," he "is free to argue that the evidence leads to guilt, and is permitted to suggest all favorable and reasonable inferences that arise from the evidence." *Commonwealth v. Stafford*, 2000 PA Super 76, 749 A.2d 489, (Pa.Super. 2000) (citations and quotation marks omitted). "[P]rosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Judy*, 2009 PA Super 148, 978 A.2d 1015 (citation and quotation marks omitted).

A distinction exists between what a prosecutor tells the jury he thinks about a witness's testimony and one who tells the jury what he thinks the evidence showed. The first is prohibited by law as usurping the function of the jury. The second, while often frowned upon and sometimes misleading, is allowed provided the distinction between personal opinion and arguing the evidence is maintained.

Clearly the effect of the ADA's closing argument did not prejudice the jury so that a fixed bias and hostility towards the Defendant was formed that prevented the jury from properly weighing the evidence and rendering a true verdict.

Furthermore, this court on at least one (1) occasion, cautioned the jury that closing arguments are not evidence, but argument. (Notes of Testimony, March 27, 2012, page 124 - 126).

17

The Defendant next two (2) claims are that the ADA erred by showing the autopsy photos of the wound to the back of the head of the victim during his closing; and, that the introduction of the photograph of the back of the victim's head and neck and the arm showing bullet wounds, even though in black and white was gruesome and inflammatory and denied the Defendant his right to a fair trial.

It should be noted that, there was no objection to the introduction of the photograph of the decedent's wounds made before or at trial. Therefore, the Defendant's claim that the introduction of the photograph of the decedent's head wound at trial was inflammatory is waived.[3]

Assuming arguendo that the issue is not waived, "Questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Kendricks*, 2011 PA Super 218 (Pa. Super. Ct. 2011) citing *Commonwealth v. Freidl*, 2003 PA Super 379, 834 A.2d 638 (Pa. Super. 2003).

> When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis: First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the

---

[3] In order for a claim of error to be reviewed on appeal, Pennsylvania Rule of Appellate Procedure 302 (a) states as follows: Rule 302. Requisites for Reviewable Issue
(a) General rule. Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.

18

minds and passions of the jurors. *Commonwealth v. Kendricks*, id. citing *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 531 (Pa. 2003) (citation omitted).

The photograph at issue was relevant to show the entrance wound to the head and the graze wound to the back of the decedent's neck to show the position of the decedent's body at the time he was shot. (Notes of Testimony, March 26, 2012, page 117 – 120). There is no suggestion that the photographs were unnecessarily gruesome or inflammatory. Thus, the probative value of introducing this evidence outweighed the potential prejudicial effect of the photograph. See *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, (Pa. 2001) (quoting *Commonwealth v. Jacobs*, 536 Pa. 402, 639 A.2d 786, (Pa. 1994)) ("Even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs"); see also *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 531-32 (Pa. 2003) (introduction of photographs was proper even though testimonial evidence to demonstrate injuries was available).

As to the ADA's showing of the photo during his closing, the jury had already seen the photograph during trial and it was admitted into evidence without objection. As such, clearly the effect of the ADA showing the photograph of the decedent's wounds during closing argument would not have prejudiced the jury in a fashion that would result in a fixed bias and hostility towards the Defendant preventing the jury from properly weighing the evidence and rendering a true verdict. Therefore, this claim is without merit.

The Defendant next claims that the court erred in introducing the forensic reports of cell phone records of Shante Stewart and Donte Cannon. The Defendant claims that the court erred in finding one of the Commonwealth's witnesses to be an expert in extracting cell phone records.

19

The admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Commonwealth v. Szakal, 2012 PA Super 159 (Pa. Super. Ct. 2012).

The Commonwealth called Detective Tankelewicz. The court allowed the Detective to testify as an expert in the field of cell phone forensics. (Notes of Testimony, March 26, 2012, pages 129, 150). The court then reconsidered its ruling. (Notes of Testimony, November 27, 2012, page 17). Furthermore, the court cautioned the jury as to Detective Tankelewicz's testimony. (Notes of Testimony, March 28, 2012).

The admissibility of an expert opinion is governed by Rule 702 of the Pennsylvania Rules of Evidence: Rule 702. Testimony by experts

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.
> Pa.R.E. 702

This court found that the testimony of Detective Tankelewicz as to the cell phone forensics would assist the jury in understanding the evidence recovered from the cell phones. Therefore the court did not abuse its discretion in allowing the testimony of Detective Tankelewicz.

20

The Defendant next claims that the Defendant was denied his right to a public trial when his family and friends were denied the right to enter in the Courtroom during two of the closing speeches.

After a review of the record, this court cannot locate in the trial transcripts if or when the family and friends of the Defendant were denied access to the courtroom or where an objection was lodged to same. Therefore, this claim is waived because of vagueness.

## CONCLUSION

Based on the foregoing, the judgment of sentence should be affirmed.

By the Court:

Rose Marie DeFino-Nastasi, J.

21